# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| SETH SNYDER BONDURANT, | CIVIL NO. 09-328 (ADM/AJB) |
| PLAINTIFF, | |
| V. | REPORT & RECOMMENDATIONS ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | |
| DEFENDANT. | |

Fay E. Fishman, Peterson & Fishman, P.L.L.P., 3009 Holmes Avenue South, Minneapolis, Minnesota 55408 for Plaintiff Seth S. Bondurant.

Frank J. McGill, Jr., United States Attorney, Lonnie F. Bryan, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415, for Defendant Michael J. Astrue, Commissioner of Social Security.

## I.    INTRODUCTION

Plaintiff Seth S. Bondurant (Plaintiff) disputes Defendant Commissioner of Social Security's (Commissioner) denial of his protective application for disability insurance benefits (DIB) and supplemental security income (SSI).  The United States District Court for the District of Minnesota has jurisdiction under the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). This matter is before this Court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.1-2. Based on the reasoning set forth below, this Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment [Docket No. 10] be **GRANTED** and that Plaintiff's Motion for Summary Judgment [Docket No. 8] be **DENIED**.

## II.    FACTS

### A. Background

Plaintiff was born in 1974. (Tr. 75.) Plaintiff is left handed. (Tr. 320.) Plaintiff was 33-years old at the time of the hearing before the Administrative Law Judge (ALJ). Plaintiff was most recently employed as an "interviewer" or talent scout. (Tr. 58.) Plaintiff was employed as an interviewer between 1999 and November of 2003. (Tr. 58.) In this position, plaintiff interviewed children who were interested in becoming actors and models. (Tr. 58.) In this job Plaintiff worked eight hours per day, five days per week. (Tr. 60.) During his workday, Plaintiff estimated that he walked for one hour, stood for one hour, sat for six hours, and reached and wrote for eight hours. (Tr. 60.) Plaintiff never lifted more than 10 pounds at work. (Tr. 60.) Prior to that job, Plaintiff worked as a telemarketer from 1997 until June of 1998. (Tr. 58.) Plaintiff worked as a delivery driver from 1994 to 1995. (Tr. 58.) Prior to that Plaintiff worked miscellaneous jobs as a teenager. (Tr. 58.)

Plaintiff states that he injured his right shoulder in 1995 while repetitively lifting heavy objects at work. (Tr. 125.) Plaintiff contends that his pain has progressed since his injury and now his pain precludes him from maintaining employment. (Tr. 125.)

### B. Relevant Medical Evidence

1.    Plaintiff's Treatment Records

In May 22, 2000, Plaintiff saw a doctor and complained of pain in his right shoulder and arm. (Tr. 293.) He reported at the time that he had a five year history of reflex sympathetic dystrophy[1] (RSD). He reported that his pain was treated in the past with steroids, Vicodin, and

---

[1] Reflex sympathetic dystrophy syndrome is "[a] neurological disorder characterized by pain, hyperalgesia, hyperesthesia, and autonomic dysfunction following injury of an extremity involving a peripheral nerve . . . ." Stanley Jablonski, *Jablonski's Dictionary of Syndromes & Eponymic Diseases* 507 (2nd ed. 1991).

Neurontin.[2] (Tr. 293.) The examining doctor's assessment was that Plaintiff had "[c]hronic right shoulder pain, probable frozen shoulder capsulitis[3] with reflex sympathetic dystrophy" and chronic pain. (Tr. 293.) The examining doctor prescribed Medrol Dose Pak. (Tr. 293.)

Plaintiff saw a doctor again in August 2002 and presented symptoms that were similar to those from his visit in 2000. (Tr. 292.) The examining doctor noted that Plaintiff's right shoulder was swollen and tender, and Plaintiff had a poor range of motion. (Tr. 292.) The doctor also noted that the right side of Plaintiff's neck was tender. (Tr. 292.)  The doctor's impression was that Plaintiff had chronic shoulder pain with RSD, tingling and hyperesthesias. (Tr. 292.) The doctor concluded that Plaintiff seems to be developing frozen shoulder syndrome. (Tr. 292.) The doctor prescribed medication for his pain. (Tr. 292.)

Plaintiff subsequently went to the doctor in September, October, and December 2002, presenting the same symptoms, which yielded similar prognoses and treatment plans. (Tr. 278, 292.) In addition, Plaintiff's doctor recommended that Plaintiff begin treatment at a pain management clinic and obtain an MRI. (Tr. 292.) Plaintiff's doctor also suggested that Plaintiff pursue physical therapy. (Tr. 278.)

On May 7, 2003, Plaintiff received an MRI of his cervical spine. (Tr. 203.) The results of the MRI were unremarkable except for "mild intervertebral disc space degeneration changes . . . in the upper cervical spine manifested by mild desiccation of the disc spaces." (Tr. 203.)

On May 14, 2003, Plaintiff saw Philip J. Rubinfeld, M.D. (Tr. 201.) During the examination, Plaintiff stated that the pain starts in his right shoulder and radiates down his arm across his neck and upper back. (Tr. 201.) Plaintiff reported that his pain persists despite the

---

[2]  Neurontin is taken "for the management of postherpetic neuralgia[, a painful condition affecting nerve fibers,] in adults." *Physicians Desk Reference* 2463 (62 ed. 2008).
[3]  Capsulitis is "[i]nflammation of the capsule of an organ or part . . . surrounding a joint." *Stedman's Medical Dictionary* 303 (28th ed. 2006).

medication he has taken. (Tr. 201.) Plaintiff complained that the pain restricts his activities of daily living and disturbs his sleep. (Tr. 201.) Dr. Rubinfeld observed:

> [T]he right arm has almost zero range of motion of the right shoulder secondary to pain both passive and active. Palpation of the shoulder is tender. Examination of the right arm reveals the right arm to be discolored, bluish in coloration with a decreased temperature as compared to the left. He has normal range of motion of the wrist and elbow joints bilaterally. He has normal range of motion of the left shoulder joint. The left arm appears normal.

(Tr. 202.) Dr. Rubinfeld's impression was that Plaintiff had complex regional pain syndrome, chronic pain syndrome, and opioid dependency. (Tr. 202.) Dr. Rubinfeld recommended a "stellate ganglion block" and concluded that Plaintiff needs to continue to his current medication (i.e., OxyContin, Percocet, and Zanaflex), "which is allowing him to perform his duties of occupation and activities of daily living." (Tr. 202.)  During his follow up appointment with Dr. Rubinfeld on July 1, 2003, Dr. Rubinfeld's impression was that Plaintiff was also suffering from depression, for which Dr. Rubinfeld prescribed Prozac. (Tr. 200.)

On July 10, 2003, Plaintiff received a "stellate ganglion block." (Tr. 199.) In his follow up appointment on July 24, 2003, Plaintiff reported that the block helped for two to three days, but then his pain returned. (Tr. 198.) Plaintiff returned to Dr. Rubinfeld in August, September, and October of 2003. (Tr. 194-197.) Plaintiff's symptoms and diagnoses were consistent with those from May of 2003. (Tr. 194-97.) Dr. Rubinfeld continued Plaintiff on his medication regimen and recommended an MRI of Plaintiff's right shoulder to rule out internal derangement. (Tr. 194-97.)

Plaintiff underwent an MRI in November of 2003. (Tr. 204.) The reviewing physician noticed an "increased signal in the infraspinatus tendon[4] consistent with tendinitis." (Tr. 204.) In

---

[4] The infraspinatus is a muscle of the shoulder joint, "the tendon of which contributes to the formation of the rotator cuff." *Stedman's Medical Dictionary* 1245 (28th ed. 2006).

December 2003, Plaintiff saw Joseph Saccoman, M.D.[5] who continued Plaintiff's medication regimen. (Tr. 277.)

In January 2004, Plaintiff saw Dr. Rubinfeld. (Tr. 193.) Dr. Rubinfeld diagnosed Plaintiff with RSD of the bilateral extremities, adhesive capsulitis bilateral, chronic pain syndrome, and opioid dependency. (Tr. 193.) In addition to OxyContin and Percocet, Dr. Rubinfeld prescribed Topamax. (Tr. 193.)

Plaintiff returned to Dr. Rubinfeld in March 2004, and Dr. Rubinfeld switched Plaintiff from OxyContin to Avinza, and prescribed Liboderm patches. (Tr. 192.) Plaintiff saw Dr. Rubinfeld in April of 2004, and Dr. Rubinfeld discontinued Avinza and prescribed Neurontin. (Tr. 191.) In May of 2004, Plaintiff saw Dr. Rubinfeld, and was again prescribed OxyContin. (Tr. 190.) In August of 2004, Plaintiff saw Dr. Rubinfeld, who recommended "continuation of current medication regimen [(i.e. Percocet and OxyContin)], which is effectively reducing his pain and improving his function and life style." (Tr. 189.) Plaintiff saw Dr. Rubinfeld again in December of 2004, who continued Plaintiff's treatment regimen. (Tr. 187-88.)

In May, June, July, August, and September of 2005, Plaintiff saw Carissa Stone, MD, Director of Alliance Medical Pain Management LLC. (Tr. 151, 154, 155, 160, 167.)  Dr. Stone's treatment was consistent with Plaintiff's treatment under Dr. Rubinfeld, and Dr. Stone noted that Plaintiff's pain was better on his medications. (Tr. 151, 154, 155.)

In April of 2007, Plaintiff again saw Dr. Saccoman. (Tr. 276.) Plaintiff presented with symptoms consistent with those previously described and Dr. Saccoman diagnosed Plaintiff with RSD.  (Tr. 276.) Dr. Saccoman noted that he would continue as Plaintiff's primary care doctor, but told Plaintiff that he should be examined by a pain specialist. (Tr. 276.)

---

[5] The record suggests that Plaintiff saw Dr. Saccoman earlier as well.

In May 2007, Plaintiff saw Diane Budnick, R.N, C.N.P., who worked with L. Michael Espeland, M.D., at the HealthEast Pain Center in St. Paul, Minnesota.[6] (Tr. 305-11.) Ms. Budnick recorded symptoms consistent as those previously described. (Tr. 305-07.)  Plaintiff reported to Ms. Budnick that he spends his time sitting, reading, and watching television, as well as playing videogames. (Tr. 306.) Ms. Budnick noted that Plaintiff was "alert and oriented times three.  His speech [was] clear and articulate and he answer[ed] questions appropriately.  His long- and short-term memory seem[ed] intact." (Tr. 306.) Ms. Budnick prescribed Cymbalta for management of Plaintiff's depression and neuropatheic pain; Ms. Budnick referred Plaintiff to physical therapy and directed Plaintiff to walk for five minutes three times per day and increase that amount by one minute each week, with a goal of 10 minutes 3 times a day. (Tr. 306.)

On June 19, 2007, Plaintiff had a follow up appointment with Ms. Budnick. (Tr. 303.) Her observations were consistent with the earlier visit, but Plaintiff reported that the Cymbalta did not relieve his symptoms. (Tr. 303.) Ms. Budnick prescribed OxyContin and directed Plaintiff to continue physical therapy. (Tr. 304.)

On June 27, 2007, Plaintiff saw Deborah Korbitz, C.N.P.,[7] who also worked with Dr. Espeland, and reported that he the OxyContin was not relieving his symptoms and he did not fill the Oxycodone prescription because "one pill wouldn't do anything for him." (Tr. 300.) Plaintiff further reported that "he feels he is unable to do any physical therapy yet due to his poor pain control at this time." (Tr. 300.) Plaintiff reported that "he is depressed, but . . . [he] feels that he uses diversion to help manage his pain by playing electronic games, walking dogs, and doing other miscellaneous things during the day." (Tr. 301.)  Ms. Budnick agreed to "cancel physical

---

[6] It appears that Dr. Espeland reviewed and approved all of the Ms. Budnick's examinations and treatment plans.

[7] It appears that Dr. Espeland reviewed and approved all of the Ms. Korbitz's examinations and treatment plans.

therapy . . . until" his pain was under better control. (Tr. 301.) Ms. Budnick told Plaintiff that he needed to walk and exercise his right arm and hand. (Tr. 301.)

On July 11, 2007, Plaintiff again saw Ms. Korbitz. (Tr. 298.) Plaintiff's mother accompanied him and reported that since Plaintiff was prescribe OxyContin Plaintiff "improved" and "he is doing more of his computer work." (Tr. 298.) Plaintiff and Ms. Korbitz discussed the possibility of a Ketamine infusion, but Plaintiff was referred for myofascial release and craniopsychotherapy to decrease pain and improve function. (Tr. 299.) Ms. Korbitz "[a]lso discussed . . . a strong desire to get [Plaintiff] out of the house and out and moving doing something to get his mind off his level of discomfort." (Tr. 299.) Ms. Korbitz encouraged Plaintiff to use his arms "to the max." (Tr. 299.)

On August 8, 2007, Plaintiff saw Ms. Korbitz. (Tr. 295.) Plaintiff reported that he has begun physical therapy, but it is difficult for him. (Tr. 296.) Ms. Korbitz prescribed trigger point injections prior to his next physical therapy session. (Tr. 296.) On August 10, 2007, Plaintiff received an injection treatment for his symptoms. (Tr. 213.)

### 2. Plaintiff's Self-Description & Testimony

In July 2005, Plaintiff completed a questionnaire in conjunction with his application for DIB and SSI. (Tr. 92-95.) Plaintiff described his pain symptoms as "burning . . . nonstop[,] 24 hrs a day." (Tr. 92.) Plaintiff felt the pain symptoms in "both shoulders down [his] [r]ight arm to [his] finger tips." (Tr. 92.) Plaintiff stated that his finger tips would go numb and turn purple. (Tr. 92.) Plaintiff stated that the pain symptoms limited his ability to cook and prepare meals, clean his house, do laundry, shop, sleep, drive, perform yard work, and perform home maintenance. (Tr. 93.)

On January 15, 2008, Plaintiff testified before the ALJ as follows: He feels intense pain in his right shoulder and arm, and he feels less pain in left arm, and his back and neck are

"extremely tight." (Tr. 323.) He cannot stand more than one hour before experiencing intense pain and he cannot walk more than 20 minutes before he is fatigued. (Tr. 325.) On good days, he will leave the house for an hour or two to do errands, such as shopping. (Tr. 325.) After running errands, he must rest two to four hours. (Tr. 326.) On bad days, he spends the day at home trying to distract himself from the pain. (Tr. 326.)  However, his pain makes it difficult for him to concentrate. (Tr. 327.)  He estimated that he has bad days five to six days per week. (Tr. 336.)

Plaintiff testified that he has "tried every single thing doctors have asked [him] to do," including physical therapy, "TENS units,"[8] "electro-stim[ulation]," "[t]rigger point injection[s]," and medications such as Lyrica. (Tr. 328.) His current medication regimen caused a "loss of concentration." (Tr. 329.) His current medication regimen "makes [his pain] manageable," but he is never without pain.[9] (Tr. 329.)  As a result of his pain he experiences frustration and depression. (Tr. 335.) His pain also prevents him from sleeping; he rarely sleeps more than an hour and a half at a time. (Tr. 329.) Because of his sporadic sleep patterns, he is "constantly fatigued" and he has a difficult time concentrating. (Tr. 330.) He cannot move his right arm above his chest, and he has a "loss of grip" and occasional tingling and numbness in his right hand. (Tr. 331-32.) He speculated that he could keep his arm out straight for five minutes. (Tr. 332-33.) His left arm is not as limited, but he feels "shooting pains"; he can lift it higher and can hold it out in front of himself easier. (Tr. 333-34.) He speculated that he can lift five pounds or less with his left arm. (Tr. 334.)  He said that he cannot carry things or reach up and take things

---

[8] This Court assumes that Plaintiff was referring to transcutaneous electrical nerve stimulation or TENS, which is "a method of pain control by the application of electric impulses to the nerve endings. . . . The electric impulses generated are similar to those of the body, but different enough to block transmission of pain signals to the brain. TENS is noninvasive and nonaddictive, with no known side effects." *Mosby's Medical, Nursing, & Allied Health Dictionary* 1638 (5th ed. 1998).

[9] Plaintiff was taking the following relevant medications at the time of the hearing: OxyContin for pain, Oxycodone for "breakthrough pain," Zanaflex, and Ambien. (Tr. 121.)

out of cupboard with his left arm. (Tr. 334). He probably would be able to write a full page at one time without resting his hand. (Tr. 335.)

> At the conclusion of the hearing, there was the following colloquy:

>> ALJ:   Mr. Bondurant, your mother is working where? You said she was working.

>> Plaintiff:  She takes care of an elderly woman.  She does light—like does the dishes for her, will fix her dinner, keeps her company, companion.

>> ALJ:  And she's got the same thing you do according to this doctor that I'm reading here.

>> Plaintiff:  Yes, sir.

(Tr. 343.)

### 3.   Social Security Disability Examination

On August 10, 2005, Plaintiff underwent a physical examination at the request of the Office of Disability Determinations. (Tr. 124.)   Hiram A. Cuevas, M.D. performed the examination. (Tr. 124.) Plaintiff told Dr. Cuevas that in 1995 he worked as a tape handler, performing repetitive motion. (Tr. 125.) Plaintiff was handling up to 1200 tapes per shift. (Tr. 125.) While in this position, he hurt his shoulder and developed pain in his right shoulder. (Tr. 125.) The pain progressed. (Tr. 125.) At the time of his physical examination, he stated that he was developing pain in his left shoulder. (Tr. 125.) Dr. Cuevas observed that Plaintiff "walks and stands with his right arm propped closely to his body." (Tr. 126.) Dr. Cuevas observed "a slight bluish-reddish hue apparent in his distal right upper extremity." (Tr. 126.) Plaintiff exhibited a limited range of motion in his cervical spine. (Tr. 127.)  Dr. Cuevas noted that Plaintiff "is tender to palpitation in the right shoulder over his AC joint and he exhibit[ed] resistance in terms of attempting to move the shoulder, as if it was ankylosed. There are severe limitations in the range of motion of his shoulder and all cause pain." (Tr. 127.) Dr. Cuevas noted that Plaintiff's distal

extremity is cool to the touch. Dr. Cuevas noted that Plaintiff's left shoulder has "nontender palapation" and the "range of motion is improved" compared to Plaintiff's right shoulder. (Tr. 127.) Dr. Cuevas observed no neurological ailments. (Tr. 128.) Dr. Cuevas's clinical impressions were that Plaintiff had complex regional pain syndrome of the right shoulder, chronic pain syndrome, opioid dependency, and RSD of the right shoulder. (Tr. 128.)

4.    Physical Residual Functional Capacity Assessment

Plaintiff underwent a physical residual functional capacity (RFC) assessment on September 1, 2005. (Tr. 139.) The assessor concluded that Plaintiff can occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk six hours in an eight hour day, and six hours in an eight hour day. (Tr. 133.) The assessor concluded that Plaintiff's ability to push or pull was limited due Plaintiff's limited range of motion in his right shoulder. (Tr. 133.) The assessor also noted that Plaintiff had a decreased range of motion in his cervical spine. (Tr. 133.) The assessor concluded that Plaintiff's ability to reach, engage in gross manipulation, and engage in fine manipulation was limited. (Tr. 135.)

Plaintiff underwent a second physical RFC assessment on October 14, 2005. (Tr. 205-12.) The findings and conclusions were the same. (Tr. 205-12.)

In October of 2007, Dr. Saccoman completed a physical RFC questionnaire in relation to Plaintiff. (Tr. 312.) Dr. Saccoman reported as follows: Plaintiff's pain and other symptoms constantly interfere with his attention and concentration. (Tr. 313.) Plaintiff is incapable of even "low stress" jobs. (Tr. 314.) Plaintiff can walk less than one block without rest or severe pain. (Tr. 314.) Plaintiff cannot continuously sit or stand for more than 30 minutes at a time. (Tr. 314.) Plaintiff needs a job that permits shifting positions at will. (Tr. 315.) Plaintiff will need to take "numerous" unscheduled breaks during the work day. (Tr. 315.) Plaintiff can never lift and carry. (Tr. 316.) Plaintiff has significant limitations in doing repetitive reaching, handling, and

fingering. (Tr. 316.) Plaintiff will likely have good and bad days, and as a result, he will likely be absent from work more than four times per month. (Tr. 316A.)

        5.    <u>Vocational Expert's Testimony</u>

The ALJ proposed a hypothetical of an individual matching Plaintiff's age, educational background, and work experience, with a diagnosis of RSD, chronic pain, and chronic fatigue. (Tr. 336-37.) The individual's restrictions include pain (and depression) and other symptoms severe enough to constantly interfere with his attention and concentration. (Tr. 337.) The individual claims to be incapable of working at a low-stress job, walking more than one block, and standing or sitting more than 30 minutes at a time, and cannot walk more than 30 minutes per day or 10 minutes at a time. (Tr. 337.) The individual needs to be able to sit, stand, or walk at will, and needs unscheduled breaks. (Tr. 337.) The individual can lift 10 pounds, but can perform no lifting with his right arm. (Tr. 337.) The individual cannot twist, grip, turn, or manipulate with his right arm, and can do so to a limited extent with his left arm. (Tr. 337.) The individual may miss more than 4 days of work per month. (Tr. 337.) Based upon this hypothetical, Norman Mastbaum, the vocational expert, concluded that the hypothetical individual could not perform any of Plaintiff's past work or any other work in the regional or national economy. (Tr. 338.)

The ALJ proposed a second hypothetical of an individual who can lift 20 pounds occasionally and 10 pounds frequently. (Tr. 338.) The individual can "sit/stand" for six hours. (Tr. 338.) The individual can perform pushing or pulling, which is limited by reduced grip strength and loss of range of motion for the right arm caused by RSD. (Tr. 338.) The individual can never climb ladders, ropes, and scaffolding, but can crawl occasionally and be in all other postures frequently. (Tr. 338.) The individual is left hand dominant. (Tr. 338.) Based upon this hypothetical, the vocational expert concluded that there are employment opportunities in the regional or national economy for the hypothetical individual. (Tr. 338.) These opportunities

include telemarketing, which is a sedentary position, and of which there are 2,500 such positions in Minnesota. (Tr. 339.)

The ALJ proposed a third hypothetical of an individual who is sedentary, can only use one arm, is 33-years old, and is unskilled. (Tr. 340.) The vocational expert concluded that an individual matching this description could work as a parking lot attendant, of which there are 1,100 positions in Minnesota, or as a surveillance system monitor, of which there are about 800 positions in Minnesota. (Tr. 340.)

On cross examination, the vocational expert agreed that two absences every three months would likely be tolerated by an employer, but more frequent absenteeism would not be tolerated. (Tr. 342.)  The vocational expert also agreed that breaks would be "fairly fixed and fairly inflexible" in these positions and a person who would have problems concentrating would have a difficult time maintaining competitive employment. (Tr. 342.)

### C. Procedural History and ALJ's Decision

Plaintiff filed his application for DIB and SSI on June 8, 2005, with an alleged onset date of November 30, 2003.  (Tr. 3G, 75.) The Commissioner denied his application on September 1, 2005, and on reconsideration October 21, 2005. (Tr. 358, 367).  Plaintiff requested a hearing before an ALJ. (Tr. 23.) The hearing was scheduled for October 3, 2007, and finally held on January 15, 2008, before Administrative Law Judge Michael D. Quayle. (Tr. 22.) The ALJ issued his decision on February 29, 2008. (Tr. 21.)

The ALJ made the following findings of fact and conclusions of law: Plaintiff has complex regional pain syndrome of the right shoulder since 1995, chronic pain syndrome, opioid dependency and RSD of the right shoulder with migration of some symptoms to the left upper extremity. (Tr. 13.)  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1. (Tr. 14.) Plaintiff has the RFC to perform light work, occasional reaching in all directions and occasional handling and fingering with his right upper extremity and frequent handling and fingering with his left upper extremity, occasional pushing and pulling with his upper extremities, frequent climbing, balancing, stooping crouching and kneeling and occasional crawling and no work on ladders, ropes, or scaffolds. (Tr. 14.) Plaintiff has no medically determinable lower extremity limitations. (Tr. 14.) While Plaintiff's medically determinable impairments could reasonably be expected to produce the Plaintiff's symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not credible to the extent they are inconsistent with the RFC assessment. (Tr. 15.) The ALJ rejected Dr. Saccoman's opinion because it was based solely on Plaintiff's complaints. (Tr. 17.) The ALJ concluded that Plaintiff could perform his past relevant work as a telemarketer, which is within the parameters of Plaintiff's current RFC. (Tr. 19.) Plaintiff has transferrable skills, such as customer service, marketing, and selling skills, as well as supervision and clerical skills. (Tr. 19.) And, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 20.) Thus, the ALJ concluded that Plaintiff is not disabled for the purposes of the Social Security Act. (Tr. 21.)

  Plaintiff requested a review of the ALJ's decision. (Tr. 7.) The appeals council denied Plaintiff's appeal. (Tr. 4.) Plaintiff subsequently brought the complaint in the present case.

### III.   ISSUES

1.     Is the ALJ's conclusion that Plaintiff's conditions do not constitute a severe impairment supported by substantial evidence?

2.     Is the ALJ's conclusion that Plaintiff's conditions do not constitute a listing impairment supported by substantial evidence?

3.     Is the ALJ's conclusion that Plaintiff had RFC for light work supported by substantial evidence?

4.     Is the ALJ's conclusion that Plaintiff can perform his past work supported by substantial evidence?

5.     Is the ALJ's conclusion that Plaintiff can perform jobs that exist in significant numbers in the national economy supported by substantial evidence?

### IV.   ANALYSIS

**Standard of Review**

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis."  *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding).

Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199.

Plaintiff contends that Defendant's uses of "post hoc rationalizations" in support of the ALJ's decision are not permitted under our standard of review. (Pl.'s Reply Mem. 4, June 9, 2009.)  Plaintiff's argument is inconsistent with the standard of review and the law in the Eighth Circuit. This Court is charged with considering the record as a whole and determining if the ALJ's decision is supported by substantial evidence. The Eighth Circuit has dictated that "[a]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case." *Benskin v. Bow*en, 830 F.2d 878, 883 (8th Cir. 1987).   Thus, if evidence in the record supports the ALJ's determination, this Court is permitted to consider it as part of the standard of review.

## Legal Framework

To be entitled to DIB and SSI, a claimant must be disabled. 42 U.S.C. §§ 423(a)(E), 1382(a)(1).  A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.

The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant

can adjust to other work in the national economy. 20 C.F.R. §§ 404.1520(a)(5)(i)-(v); 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Ordinarily, the Commissioner can rely on the testimony of a vocational expert to satisfy its burden. *Long v. Chater*, 108 F.3d 185, 188 (8th Cir.1997).

1.    **Is the ALJ's conclusion that Plaintiff's conditions do not constitute a severe impairment supported by substantial evidence?**

At step two, a claimant must show he or she has a "severe impairment," which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). Under current regulations an impairment is not severe if it falls into the definitions in 20 C.F.R. §§ 404.1521 and 416.921.

The ALJ concluded that Plaintiff has the following severe impairments: "complex regional pain syndrome of the right shoulder since 1995, chronic pain syndrome, opioid dependency and reflex sympathetic dystrophy of the right shoulder with migration of some symptoms to the left upper extremity." (Tr. 13.) The ALJ analyzed Plaintiff's depression under 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04, and concluded that Plaintiff's depression does not rise to the level of a severe impairment. (Tr.13-14.) Plaintiff contends that the ALJ erred in concluding that the Plaintiff's depression does not qualify as a severe impairment. (Pl.'s Mem. 31, May 6, 2009.)

This Court concludes that the ALJ erred in analyzing step two under 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04. At step two in the sequential analysis, the ALJ must consider "the combined effect of all [a claimant's] impairments without regard to whether any such

impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. The ALJ did not adhere to this mandate by considering Plaintiff's depression apart from the other impairments and under 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04, which is the required inquiry in step three. But, this Court concludes that this error is harmless because the ALJ's other determinations are supported by substantial evidence.

**2.      Is the ALJ's conclusion that Plaintiff's conditions do not constitute a listing impairment supported by substantial evidence?**

A step three in the sequential analysis, the ALJ must consider whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant bears the burden of establishing the impairment is a disabling impairment (i.e., meets or equals listed impairmen). *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).  In the present case, the ALJ considered whether Plaintiff's impairments satisfied the listing impairments at 1.02, 1.08, and 12.04. (Tr. 13-14.)

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990). An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A finding that an impairment equals a listing must be based on medical evidence; symptoms alone are insufficient. 20 C.F.R. § 404.1526(b); *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir.2008); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhardt*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 1.00I1.

***Listing 1.02***

"As is true in many disability cases, there is no doubt that the claimant is experiencing pain . . . ." *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997) (internal quotation and citation omitted).  But this Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199.

A "disabling impairment" under listing 1.02 is, in relevant part, an impairment that is:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With . . .
>
> A. Involvement of one major peripheral joint in the upper extremity (i.e., shoulder . . . or writs-hand), resulting in inability to perform fine and gross movements effectively . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, at 1.02B. "Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities . . . ." *Id.* at 1.00B2c. "[E]xamples of inability to perform fine and gross movements effectively include . . . inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." *Id.* at 1.00B2c.

Substantial evidence supports the ALJ's conclusion that Plaintiff's condition does not satisfy the listing requirements of 1.02. There is evidence that Plaintiff has use of his left arm. There is no objective medical evidence that Plaintiff has the "[i]nability to perform fine and gross movements effectively" with his left arm.

### Listing 1.08

A "disabling impairment" under listing 1.08 is an impairment that is a "[s]*oft tissue injury (e.g. burns)* of an upper . . . extremity . . . under continuing surgical management . . . . directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 1.08. There is no evidence that Plaintiff is not under continuing surgical management as defined by 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 1.00M. Therefore, the ALJ's conclusion is supported by substantial evidence.

### Listing 12.04

A "disabling impairment" under listing 12.04 is an impairment that is "[c]haracterized by disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04. The required level of severity is met when the individual's affective disorder results in two of the following[10]:

1.   Marked restriction of activities of daily living; or
2.   Marked difficulties in maintaining social functioning; or
3.   Marked difficulties in maintaining concentration, persistence, or pace; or
4.   Repeated episodes of decompensation, each of extended duration
     . . . .

*Id.* at 12.04B.

The ALJ concluded that Plaintiff experiences "no more than mild restrictions of daily living and difficulties maintaining social function and concentration, persistence and pace." (Tr. 13-14.) These conclusions are supported by the record. As recently as 2007 Plaintiff reported that "he is depressed, but . . . [he] feels that he uses diversion to help manage his pain by playing

---

[10] "The required level of severity for [affective] disorders is met when the requirements in both A and B are satisfied, or when the requirements of C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04. In the present case, "B" is the only stage at issue.

electronic games, walking dogs, and doing other miscellaneous things during the day." (Tr. 301.) Plaintiff also reported that he spends his time sitting, reading, and watching television, as well as playing videogames. (Tr. 306.) And in 2007 it was also noted that Plaintiff was "alert and oriented times three.  His speech [was] clear and articulate and he answer[ed] questions appropriately.  His long- and short-term memory seem[ed] intact." (Tr. 306.) Plaintiff testified that he lives with his mother and on good days, he will leave the house for an hour or two to do errands, such as shopping. (Tr. 325.) All of these factors support the conclusion that Plaintiff's mental condition does not rise the required level of severity to qualify as mental impairment.

Plaintiff's contention that the ALJ's conclusion is not supported by substantial evidence is based upon Plaintiff's own statements concerning his affective disorder. But, the ALJ concluded that Plaintiff's statements concerning the limiting effects of his symptoms are not credible. (Tr. 15-19.) As will be explained in further detail later, this Court concludes that the ALJ's determination as to Plaintiff's credibility is supported by substantial evidence.

Therefore, this Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's conditions do not constitute a listing impairment.

### 3.      Is the ALJ's conclusion that Plaintiff had RFC for light work supported by substantial evidence?

In steps four and five, the Commissioner assesses an individual's RFC. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). RFC is defined as the most a claimant can do despite the limitations of the individual's impairments.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In the present case, the ALJ concluded that Plaintiff has the RFC to perform light work. (Tr. 14.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some

> pushing and pulling of arm or leg controls. . . . If someone can do
> light work, [the Commissioner] determine[s] that he or she can also
> do sedentary work . . . .

20 C.F.R. §§ 404.1567(b), 416.967(b).  The RFC to perform sedentary work requires the ability

to lift no more than 10 pounds at a time and occasionally lift or carry articles like docket files,

ledgers, and small tools.  20 C.F.R. §§ 404.1567(a), 416.967(a).  "Jobs are sedentary if walking

and standing are required occasionally and other sedentary criteria are met." *Id.*

The ALJ concluded that Plaintiff has the RFC to perform light work, occasional reaching

in all directions and occasional handling and fingering with his right upper extremity and

frequent handling and fingering with his left upper extremity, occasional pushing and pulling

with his upper extremities, frequent climbing, balancing, stooping crouching and kneeling and

occasional crawling and no work on ladders, ropes, or scaffolds. (Tr. 14.) The ALJ also

concluded that, while Plaintiff's medically determinable impairments could reasonably be

expected to produce the Plaintiff's symptoms, Plaintiff's statements concerning the intensity,

persistence, and limiting effects of his symptoms are not credible to the extent they are

inconsistent with the RFC assessment. (Tr. 15.) The ALJ also rejected Dr. Saccoman's opinion

because it was based solely on Plaintiff's complaints. (Tr. 17.)

Plaintiff contends that ALJ's determination is unsupported by substantial evidence

because the ALJ erred in concluding that Plaintiff's testimony was not credible and Dr.

Saccoman's responses to RFC questionnaire should not be given much weight. This Court

concludes the ALJ's determination is supported by substantial evidence. The RFC determination

is supported by the objective medical evidence and the RFC evaluation.  And for the reasons set

forth below, this Court concludes that the ALJ's determination is supported by substantial

evidence.

*Plaintiff's Credibility*

This Court "defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence" *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Holmstrom v. Massanari,* 270 F.3d 715, 721 (8th Cir. 2001). In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008); *Polaski,* 739 F.2d at 1322. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000). The ALJ need not explicitly discuss each factor. *Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir. 2005). "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." *Id.* (quotation omitted). "The inconsistencies between [a claimant's] allegations and the record evidence provide sufficient support for the ALJ's decision to discredit [a claimant's] complaints of pain." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005).

The ALJ's opinion demonstrates that although he failed to specifically cite *Polaski*, he considered the appropriate factors.  This Court concludes that the ALJ's credibility determination is supported by substantial evidence.

First, as the ALJ noted, Plaintiff was never prescribed any functional restrictions. In fact as recently as 2007, Plaintiff was repeatedly instructed to use his arms to the maximum of their capabilities.

Second, Plaintiff's daily activities evince some inconsistency with his stated limitations. Plaintiff testified that he is able to go shopping, interact with his dogs, play videogames, read, and watch television. Plaintiff cites *Baumgarten v. Chater* for the proposition that Plaintiff's activities of daily living do not support a finding he can perform full-time competitive work. 75 F.3d 366, 369 (8th Cir. 1996). In *Baumgarten*, the Eighth Circuit rejected a finding that the claimant can perform the physical demands of work where the claimant made her bed, prepared food, performed light housecleaning, grocery shopping, knitting, crocheting, and visited friends. *Id.* The Eighth Circuit noted that "[t]o establish disability, [a claimant] need not prove that her pain precludes all productive activity and confines her to life in front of the television." *Id.* But, in contrast to *Baumgarten*, the ALJ did not conclude that Plaintiff's daily activities evinced the inability to perform work. Rather the ALJ concluded that these activities were inconsistent with Plaintiff's statements regarding the limiting effect of his condition. In the present case, the ALJ's determination is also supported by other credibility considerations. *Contra id.* at 370 (holding that "[w]hen viewed in the light of several inconsistencies in the ALJ's reading of the record, however, this evidence is insufficient to support the ALJ's decision to discount [the claimant's] subjective complaints of pain").

The ALJ noted that Plaintiff's contention that his pain prevents him from working is also contradicted by the fact that Plaintiff presented similar symptoms in 2000, 2002, and 2003, and was employed during this period. *See Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990) (noting that working with impairments over a period of years without any worsening cannot

support a claim for disability). In 2000, Plaintiff stated that he had a five year history of RSD. Plaintiff described his pain between 7/10 and 9/10 on 10 point scale in May of 2003. (Tr. 201.) Plaintiff reported a level of pain at 8/10 in July 2003. (Tr. 198.) Plaintiff reported a level of pain 8/10 to 9/10 in August and September 2003. (Tr. 195, 197.) Plaintiff's alleged onset date was November 30, 2003. In August 2007, Plaintiff described his pain level as 8/10. (Tr. 295.) Likewise, Plaintiff testified that his mother has the same condition and she is gainfully employed.

There is an absence of objective medical evidence to support the Plaintiff's complaints. Plaintiff is left-handed. Dr. Cuevas and Ms. Korbitz both determined Plaintiff has grip strength in his left hand of 4/5. Ms. Korbitz noted that Plaintiff can rise from a seated to a standing position without difficulty and he had a normal gait and can ambulate independently. As recently as August 2007, Plaintiff had grip strength in his right hand of 2/5. All of these factors were taken into consideration by the ALJ in making the RFC determination.

Contrary to Plaintiff's contentions, the objective medical evidence supports the conclusion that Plaintiff can perform work with the benefit of his medication regimen and he does not have problems concentrating. Plaintiff consistently reported to doctors that he functions better on medication. Plaintiff testified at the hearing that his medication "makes it manageable." (Tr. 329.) In July of 2007, Plaintiff's mother reported that since Plaintiff was prescribed OxyContin Plaintiff "improved" and "he is doing more of his computer work." Also in 2007, Plaintiff was described as "alert and oriented times three. His speech [was] clear and articulate and he answer[ed] questions appropriately. His long- and short-term memory seem[ed] intact." (Tr. 306.)

Plaintiff contends the ALJ improperly considered the fact that Plaintiff received a worker's compensation settlement, public assistance, and support from his mother. First, this Court concludes that these factors are supported by the record. Second, while these factors do not fall within the required areas of inquiry, Plaintiff has presented this Court with no law that prohibits consideration of other factors in addition to the required areas of inquiry. Plaintiff reported similar symptoms between 2000 and 2003 as he presented in 2007. The difference was that he was employed between 2000 and 2003, and he was not employed in 2007. The ALJ's speculation that Plaintiff lacked motivation to pursue employment after 2003 because of his worker's compensation settlement, his public assistance, and support from his mother is not unreasonable in the present case. And this Court does not conclude that remand is warranted where the ALJ considered required areas of inquiry.

Likewise, Plaintiff contends that the ALJ improperly considered the fact that he smokes despite warnings of his doctor to quit smoking. This Court concludes that the record supports a determination that Plaintiff was frequently told by his treating doctors that he should quit smoking. Thus, where the ALJ also considered required areas of inquiry, this Court concludes that it was not unreasonable for the ALJ to cite Plaintiff's refusal to quit smoking as part of a broader analysis of Plaintiff's credibility. *Contra Kelley v. Callahan*, 133 F.3d 583, 590 (8th Cir. 1998) (holding that it is improper to deny benefits *solely* on a claimant's failure to quit smoking).

### Treating Physician's Opinion

Under the current regulations, the ALJ is direct to consider every medical opinion received. 20 C.F.R. § 404.1527(d). Generally, more weight is given to opinions from treating physicians, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective

to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." *Id.* at 404.1527(d)(2). If the ALJ finds a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," then it will be accorded controlling weight. *Id.* If the ALJ determines that the treating doctor's opinion does not get controlling weight, then the ALJ must consider other factors, including "any factors . . . which tend to support or contradict the [treating physician's] opinion," to determine the weight to be given the treating doctor's opinion. *Id.* "While the opinion of a treating physician is entitled to substantial weight, it is not conclusive because the record must be evaluated as a whole. Moreover, a treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion." *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) (citation and quotation omitted). The ALJ may give little weight to a treating physician's opinion if that opinion rests solely on the claimant's complaints and is unsupported by objective medical evidence. *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993)

The ALJ rejected Dr. Saccoman's opinion because the ALJ concluded that his opinion was based solely on Plaintiff's complaints of pain. (Tr. 17.) This Court concludes that the ALJ's determination is supported by substantial evidence. Dr. Saccoman reported that Plaintiff's pain interferes with his concentration, but in 2007, Plaintiff was described as "alert and oriented times three.  His speech [was] clear and articulate and he answer[ed] questions appropriately.  His long- and short-term memory seem[ed] intact." (Tr. 306.)  Dr. Saccoman states that Plaintiff is incapable of even "low stress" jobs, but Plaintiff was employed while experiencing pain comparable to the pain he described after his alleged onset date. Dr. Saccoman stated that Plaintiff can walk less than one block, but in 2007, Plaintiff was prescribed walking as part of his

treatment and states that he does so on occasion. Plaintiff also reports going shopping with his mother and playing with his dogs. Dr. Saccoman reported that Plaintiff cannot continuously sit more than 20 minutes per day, but Plaintiff testified that on bad days he sits for multiple hours at a time. Dr. Saccoman reported that Plaintiff cannot stand more than 30 minutes at one time, but there is no objective medical evidence to support this contention.  Dr. Saccoman reported that Plaintiff can never lift or carry, but in 2007 Plaintiff was instructed to use his arms to the maximum and Dr. Cuevas concluded that Plaintiff can lift 10 pounds frequently. Dr. Saccoman reported a grip strength, finger manipulation, and arm reaching abilities of zero percent for Plaintiff's left arm. But, as recently as August 2007, Plaintiff had grip strength in his right hand of 2/5 and was able to raise his arm to chest level at the hearing. (Tr. 331.) Dr. Saccoman reported that Plaintiff would need to take 4 or more days off per month. There is no objective medical evidence to support this conclusion.

Plaintiff contends that Dr. Saccoman's opinion is based upon the clinical findings of fatigue, atrophy, and fatigued muscles. (Tr. 312.) But, the ALJ considered these findings when determining the RFC. The ALJ concluded that Dr. Saccoman's opinion as to the limiting effects of these findings deserved little weight. The ALJ is also directed to consider "any factors . . . which tend to support or contradict the [treating physician's] opinion." 20 C.F.R. § 404.1527(d)(6).  The ALJ clearly did so in the present case. And for these reasons, this Court concludes that it was not unreasonable for the ALJ to not give much weight to Dr. Saccoman's opinion.

**4.      Is the ALJ's conclusion that Plaintiff can perform his past work supported by substantial evidence?**

In step four, the Commissioner assesses an individual's RFC to determine if the individual's condition precludes him or her from performing the individual's past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The ALJ relied upon the testimony of the vocational expert and determined that Plaintiff's past relevant work as a telemarketer is within the parameters of Plaintiff's RFC. (Tr. 19.)  Plaintiff contends that the ALJ's determination is not supported by substantial evidence because the hypothetical submitted to the ALJ did not include the limitations of Dr. Saccoman. (Pl.'s Mem. 32, May 6, 2009.)

"A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence." *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (quotation omitted). "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994).  For the reasons discussed earlier, the ALJ rejected Dr. Saccoman's characterization of Plaintiff's RFC. Even if the ALJ erred in concluding that Plaintiff has RFC to perform light work, Plaintiff's relevant past work as a telemarketer constitutes sedentary work. 20 C.F.R. §§ 404.1567(a), 416.967(a). Therefore, this Court concludes that the ALJ's conclusion that Plaintiff can perform his relevant past work as a telemarketer is supported by substantial evidence.

**5.      Is the ALJ's conclusion that Plaintiff can perform jobs that exist in significant numbers in the national economy supported by substantial evidence?**

In step five, the Commissioner assesses an individual's "RFC" to determine if the individual's condition precludes him or her from making an adjustment to work other than the

individual's past work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The ALJ considered a hypothetical of an individual who is a sedentary, can only use one arm, who is 33-years old and is unskilled. (Tr. 340.) The vocational expert concluded that an individual matching this description could work as a parking lot attendant, of which there are 1,100 positions in Minnesota, or as a surveillance system monitor, of which there are about 800 position in Minnesota. (Tr. 340.) The ALJ rejected Plaintiff's proffered additional limitation of frequent and unpredictable breaks, and frequent absenteeism because these restrictions were unsupported by substantial evidence. (Tr. 20.) Plaintiff's testimony and Dr. Saccoman's RFC questionnaire responses are the only evidence to support these restrictions. As discussed earlier, this Court concludes that the ALJ's conclusion that Plaintiff's testimony and Dr. Saccoman's RFC questionnaire responses were not credible is supported by substantial evidence.  Therefore, this Court concludes that the ALJ's conclusion that Plaintiff has RFC to perform work other than Plaintiff's past work is supported by substantial evidence.

## V.    RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Commissioner's Motion for Summary Judgment [Docket No. 10] be **GRANTED**; that the Plaintiff's Motion for Summary Judgment [Docket No. 8] be **DENIED.**


Dated:        1/25/2010                              s/ Arthur J. Boylan
                                        Arthur J. Boylan
                                        United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that

specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before February 8, 2010.